**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

CHRIS JACKSON

        Plaintiff,

v.                                   Case No. 06-CV-15274

COUNTY OF WASHTENAW, et al.,

        Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
"PLAINTIFF'S MOTION TO STRIKE . . . " AND GRANTING
DEFENDANT'S "MOTION FOR SUMMARY JUDGMENT"**

Pending before the court is a motion for summary judgment, filed on September

4, 2007 by Defendant Detective Everette Robbins.[1]  On September 21, 2007, Plaintiff

Chris Jackson filed a "Motion to Strike" an expert report and Defendant's motion, which

relies in part upon the report.  The matters are fully presented to the court and a hearing

was held on October 31, 2007.[2]  The court will, for the reasons stated below, grant in

---

[1]Plaintiff stipulated to the dismissal of Defendant County of Washtenaw from this action.  (9/14/07 Stipulation and Order of Dismissal.)  Plaintiff's complaint also asserts claims against "John Doe Supervisory Officers."  (*See* Pl.'s Compl.)  Because the complaint is bereft of any separate factual allegations or claims for relief with respect to any supervisory officers, dismissal on the pleadings for failure to state a claim is appropriate.  *See* Fed. R. Civ. P. 12.  Because only Defendant Robbins remains in the case, the court will dispense with the plural designation and refer to Robbins as "Defendant."

[2]Plaintiff's counsel did not appear before the conclusion of the hearing and therefore waived oral argument.  The court docketed a notice of the hearing on September 13, 2007.

part and deny in part Plaintiff's motion, grant Defendant's motion for summary judgment

and deny Defendant's motion for sanctions.

## I. PLAINTIFF'S MOTION TO STRIKE

Plaintiff contends that Defendant did not provide a copy of the expert report of

William J. Corbett until after the deadline required by the court's scheduling order. (Pl.'s

Mot. to Strike at 4-6.) The report appears as Exhibit G to Defendant's Motion for

Summary Judgment. Plaintiff argues that the court should strike the report and

Defendant's motion, contending that Defendant acted willfully and with the purpose of

gaining an unfair tactical advantage. (*Id.* at 7-8.) Defendant responds and concedes

that the report, which Defendant received on August 30, 2007, was not faxed to Plaintiff

until the following day. (Def.'s Resp. at 2.) Nor does Defendant contest that the

discovery deadline was August 3, 2007 and that any expert report was due to Plaintiff at

least four weeks before the close of discovery. (*See generally id.*; 4/2/07 Scheduling

Order at 2-3.) Defendant argues that (1) he gained no tactical advantage, (2) Plaintiff

has known since at least July 20, 2007 that Defendant listed this expert as a potential

witness and (3) Plaintiff never requested to depose the expert, who remains available

for deposition. (Def.'s Resp. at 2.) Defendant agrees to voluntarily withdraw the

expert's report (Exhibit G) from the motion for summary judgment but requests that the

report "not be excluded for matters other than Defendant's Motion for Summary

Judgment." (*Id.* at 1-2.)

The court need not decide for what other purposes the expert report may be

available to Defendant. With respect to Defendant's Motion for Summary Judgment, the

court accepts Defendant's voluntary withdrawal of the exhibit and will, accordingly, grant

that limited relief to Plaintiff. Further, the court will strike the portion of Defendant's argument section, (Def.'s Mot. for SJ at 23), that relies upon the report. The court is not persuaded that it should grant Plaintiff's request to dismiss the motion for summary judgment. The court relies on Defendant's representation that, within a day of its receipt, counsel sent a copy to Plaintiff. Assuming that timeline, the court discerns no tactical advantage gained or other willful misconduct that would merit a punitive remedy. Further, as explained below, Defendants' motion for summary judgment relies on the expert opinion only in part and can be decided without reference to the expert report. Even with a different timeline, the report in any event has no effect on the court's analysis of Defendant's motion and thus gives him no advantage. The court will therefore grant in part and deny in part Plaintiff's Motion to Strike.

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Background

Plaintiff's claims arise from his detention as a suspect for an unsolved 1991 murder that became a "cold case," but was reopened for investigation in 2004. As described below, Plaintiff filed suit because Defendant allegedly solicited false testimony against Plaintiff at the preliminary examination where the Michigan trial court found probable cause and bound Plaintiff over for trial on murder charges. The prosecutor would later drop the charges after another man confessed to the crime.

Plaintiff and Lisa Shaw, who lived separately and were never married, nonetheless developed a relationship and together produced a child named Chris

Jackson, Jr. (Media Reports at 2-6, Def.'s Mot. Ex. A)[3]  On May 27, 1991, Shaw was found murdered in her apartment in Ypsilanti, Michigan. (*Id.*)  Though police investigated Plaintiff's involvement, he was not charged and the investigation became a cold case assigned to Defendant in 2004. (Def.'s To Do List at 8-9, Def.'s Mot. Ex. 2.) Defendant's investigation led to a June 9, 2005 felony warrant charging Plaintiff with the murder of Shaw. (Felony Complaint and Warrant at 885-86, Def.'s Mot. Ex. 40.)

Plaintiff's preliminary examination occurred in Ypsilanti in state court on August 8, 2005 before Hon. John B. Collins.[4]  Defendant obtained counsel to represent him at the hearing. (Preliminary Examination Transcript at 1, Def.'s Mot. Ex. F.)  The parties stipulated that Shaw's death was a homicide. (*Id.* at 144.)  Detective Sergeant Brian Miller described the scene and presented photographs of it. (*Id.* at 71-81.)  Shaw was found bound and gagged in her master bedroom. (*Id.* at 73.)

Frank Combs, a detective for the Washtenaw County Sheriff's Department, described his investigation of Shaw's murder. (*Id.* at 97-124.)  He interviewed Plaintiff on the morning of May 27, 1991. (*Id.* at 98.)  He recounted Plaintiff's first version of the events leading up to when Plaintiff claims he found Shaw lying face-down in her apartment. (*Id.* at 100.)  Beginning around noon, Plaintiff went with Brian Williams to a

---

[3]Like Defendant, the court will use the bate-stamped page numbering when it cites to the factual record so marked and appended to Defendant's motion.  It appears that the bate-stamping is limited to the numbered exhibits whereas the letter-designated exhibits contain independent page numbering.  Separately, the court commends Defendant for his thorough statement of facts and the meticulous citation to the record.

[4]The state court overruled or took under advisement several of Plaintiff's objections, which mainly raised hearsay objections.  For purposes of this case, this court need not revisit any of those rulings.

barbecue and then to go play basketball until about 4:30 p.m.  (*Id.* at 100-01.)  The two then went to a festival in downtown Detroit and returned to Ypsilanti around midnight.  (*Id.* at 101.)  They stopped at a Dairy Mart and Plaintiff called Shaw but got no answer, so he and Williams went to her apartment.  (*Id.* at 101-02.)  Upon arrival, Plaintiff entered through the otherwise-locked lobby door after making small talk with a group of women who were leaving.  (*Id.* at 102-03.)  Plaintiff did not indicate if Williams accompanied Plaintiff upstairs.  (*Id.* at 103.)  Plaintiff entered Shaw's apartment through her open front door.  (*Id.*)  He found her lying face down, with her hands bound behind her and with his infant son on top of her head.  (*Id.*)  Plaintiff kicked or tapped her with his foot "to see if she was alive or dead," and called her name once but she was unresponsive.  (*Id.* at 103-04.)  He looked around the apartment for other people but found no one.  (*Id.* at 104.)  He picked up his son, who was unharmed, left the apartment, drove Williams home and went to Plaintiff's mother's home to wake her and report what he found.  (*Id.* at 105.)  Combs averred that Plaintiff was sure that Williams had been with him and that Plaintiff entered the apartment through the front door, answering no when asked if he entered through the bedroom window.  (*Id.* at 105-06.)  Combs played back a tape of the interview and Plaintiff verified that its contents were accurate.  (*Id.* at 106.)

Combs interviewed Plaintiff again a few hours later on the same day, after a meal break.  (*Id.* at 107, 115.)  Combs observed Plaintiff's shoes and "had a feeling that his shoes would match up to the shoeprints that were found outside the window."  (*Id.*)  Combs described how Plaintiff's version of events changed.  Plaintiff said that Williams was not with him.  (*Id.*)  He entered through the lobby door the same way, but Shaw's

apartment door was locked by a deadbolt. (*Id.* at 108.) Plaintiff then "looked in the window" of the apartment "and saw her laying [sic] there with her arms behind her, and then he went in, and the same thing occurred. He went in, he tapped her foot to see if she was still alive or dead, and picked up his child and left." (*Id.*)

> Q: Did he explain how he was able to get into the apartment this time if it was locked?
>
> A: Well, I asked him at that point, "If you left, are you sure the deadbolt was still on?" He said, "Yes, the deadbolt was still on." So that told me that there's only one other exit, which would be the window.

(*Id.*) Plaintiff also said he had not spoken to Shaw that day. (*Id.* at 109.) Plaintiff denied having keys to Shaw's apartment. (*Id.* at 109-10.) "I don't recall him actually saying that he went in the window, but he went to the window and then went in. He had no key, so he said he went in." (*Id.* at 110.) The court asked about smudges on photographs of the window, and the prosecution responded that, unless there was a continuance, no one would testify about the smudges. (*Id.* at 123.)

Brian Williams testified and denied that he accompanied Plaintiff to Shaw's apartment complex around the time she was discovered dead. (*Id.* at 126.) "I have no idea why he said I was there if I wasn't there." (*Id.* at 135.) Williams did spend time with Plaintiff that day when they met at a friend's barbecue and then went to downtown Detroit for "a Freedom Fest concert." (*Id.* at 127, 129.) Williams first lied to police and said he did not see Plaintiff for two days, explaining that he "didn't know what was going on" and was still under the influence of alcohol when the police came to question him in the morning. (*Id.* at 127-29.) At a second interview, Williams admitted to police that he was with Plaintiff that night. (*Id.* at 130.) According to Williams, Plaintiff never asked

Williams to lie for him or to say they were together at Shaw's apartment complex.  (*Id.* at 131.)  Around midnight, Plaintiff dropped Williams off at Williams's mother's house.  (*Id.* at 132.)  Plaintiff told Williams that Plaintiff would go home and call Shaw from Plaintiff's mother's house.  (*Id.* at 133.)  Plaintiff later told Williams about finding Shaw, but Plaintiff did not mention how he entered the apartment.  (*Id.* at 134.)

Celeste Craig, Plaintiff's former friend, spoke with Plaintiff before she spoke to police about Shaw's murder.  (*Id.* at 136-38.)  Plaintiff told her some police would come to her to speak with her "about his baby mother."  (*Id.* at 138.)  He told her to tell the police that she was with him from 9:00 p.m. to 2:00 a.m. on both Saturday and Sunday.  (*Id.* at 138-39.)  She did not know why Plaintiff asked her to lie.  (*Id.* at 139.)  She lied when she first spoke with the police but told them the truth during a second conversation.  (*Id.*)  Plaintiff told her about entering Shaw's apartment.  (*Id.* at 140.)  "He knocked on her door, she didn't come to the door, he went to the back, the door was cracked, he walked in, and she was laying on the floor."  (*Id.*)[5]

Shelia Marie McCormick, who once dated Plaintiff, recounted how he frightened her during an argument by threatening "'I'll do you like I did my baby's mom.'"  (*Id.* at 7-9, 11-13.)  According to Tracey Reed, another former girlfriend of Plaintiff, "we got into a fight a couple times, and he used to always say -- every time he'd get mad or want to fight, he'd always say he going to do you like he did his baby mama."  (*Id.* at 22-24.)  She further stated that at the time of such statements she and Plaintiff would be fighting physically.  (*Id.* at 25.)  Latonya Witherspoon, Plaintiff's year-long girlfriend at the time of

[5]Craig appears to be alone in her understanding that Shaw's apartment had a back door.

the hearing, stated that Plaintiff referred to Shaw as "his baby mother." (*Id.* at 82-84.) He told Witherspoon that he "could get away with anything" and that the police could only hold him for ninety days. (*Id.* at 85, 87-88.) She confirmed that she told Defendant that, when she argued with Plaintiff, he would threaten to choke her with a telephone cord. (*Id.* at 86, 88.)

Shannon Denise Davis,[6] another former girlfriend of Plaintiff, averred that their relationship was "[v]iolent at the end." (*Id.* at 90.) "I was on the phone, and he wanted me off the phone. He got upset, snatched the cord out of the wall, kind of like wrapped it around his hands. We had some words. That was basically it." (*Id.* at 91.) Plaintiff did not do anything with the cord, but Davis claimed "he said he could kill me or he wanted to kill me, but he didn't do anything after that." (*Id.* at 92.) Davis further stated that she testified at Plaintiff's January 2005 probation violation hearing and that Plaintiff's public defender "told me to say that, when the prosecutor had asked me questions, just to continue to say that I didn't remember and I didn't recall, and that would be the only thing that would help Chris get out of jail." (*Id.* at 93.) She admitted that such statements, which she made at the probation violation hearing, were not true. (*Id.* at 94.)

Louis E. Wyatt testified that he visited Shaw at her apartment, which was on the bottom floor below street level, around the third week of May 1991. (*Id.* at 26-29, 38.) He met her at a barbecue and she told him that she recently broke up with Plaintiff but that he would not let her go. (*Id.* at 28, 34-35.) While in the apartment, Shaw paced

---

[6]As explained further below, Plaintiff contends that Defendant caused Davis to give the following untruthful testimony. (Pl.'s Compl. at ¶¶ 12-14.)

and peered out the window and told Wyatt to keep his voice down in case Plaintiff was listening near the window.  (*Id.* at 35-38.)  Tamiko Johnson, Shaw's best friend, averred that she visited Shaw a few days before her death and that Johnson heard a loud, argumentative and angry male voice on the other end of a phone conversation Shaw had in Johnson's presence.  (*Id.* at 53-55.)  Shaw told her Plaintiff "had told her that, if he couldn't be with her, that nobody else would."  (*Id.* at 58.)  Shaw showed Johnson a knife that Shaw kept under her mattress to protect herself from Plaintiff if he came to the apartment.  (*Id.* at 59-60.)

Ida Jackson, Plaintiff's mother, (*id.* at 41), also testified at the preliminary examination.  She stated that Plaintiff came home late at night to tell her that Shaw was on the floor and that he needed Ida's to help him notify Shaw's parents and to drive him back to Shaw's apartment.  (*Id.* at 42-44.)  The police were at Shaw's apartment, where they later handcuffed Plaintiff and, learning that Ida was the grandmother, gave her Plaintiff's baby.  (*Id.* at 50.)  Ida stressed that Plaintiff still seemed interested in having her notify Shaw's parents.  (*Id.*)  She asked, "if my son had killed somebody, how in the world he's going to want to go get the mother and the daddy and take them over there to that mess?  Why?"  (*Id.*)

Bill Weaver, Jr., a friend who introduced Plaintiff to Shaw, offered somewhat confusing testimony that is better to reproduce than to paraphrase.[7]

Q: Now, do you recall around the time that Lisa Shaw was killed?  And that would be late May, May 27th of 1991, around that time?

_____

[7]Plaintiff contends that "witness Billy Weaver testified that Detective Robbins told him to say things that were not true about Mr. Jackson."  (Pl.'s Compl. at ¶ 15.)

A: Your honor, can I please tell the truth in this matter?

Court: Pardon?

A: I said may I please tell the truth in this matter?

Court: Well, I wish you would.

A: Thank you.  Because I really didn't want to come do this, and this man deserves a fair trial, and I'm not going to be the one to do the same thing that happened in my fellow case where I got all this time now, I got a guy's getting promised stuff to say stuff.  I'm not going to do that.  I can't do it.

Q: Sir, are you trying to say somebody tried to get you to come here and lie?

A: What I'm trying to say is I was promised something to come here and say this, and I'm not going to do it.  It's not right.

Q: You were promised something?

A: Yes, sir, and it's not right.

Q: Who promised you something?

A: Mr. Robbins and the federal -- the new federal prosecutor.  That's what happened in my federal case.  I'm not going to do it.

Q: You're saying somebody promised you to come here and tell the truth?

A: No, they promised me the time off my sentence and they promised me to stay at Milan[8] if I said what they wanted me to say.  I'm not going to do it.

* * *

Q: Now, do you recall a conversation with Detective Robbins, the person you're referring to, that was tape-recorded?

---

[8]This court notes that a federal correctional facility is located in Milan, Michigan in southern Washtenaw County.

A: Yeah, pretty much. But the reason why I said that is because I wanted to come get on the stand and tell the truth, because if I didn't say it, I don't know who else they'll promise what.

Q: So you wanted to tell the truth?

A: Yeah.

Q: Now you have a problem with telling the truth?

A: I'm telling you the truth now. That's why I said this.

Q: Do you have something to say about what happened between Lisa Shaw and Christopher Jackson or not?

A: I don't know what happened between Lisa Shaw and Christopher Jackson.

* * *

Q: Did Christopher Jackson ask you to say you two were together?

A: He didn't ask me that. If he said that, then he lied. He might have asked somebody else that. He didn't ask me that.

Q: Did he talk to you about where he was the night that Lisa was killed?

A: If I recall correctly, I think he might have told me he was at home at his mom's house.

Q: Did he ever tell you he had anything to do with Lisa's death?

A: No, sir. And he cried at the funeral, too. He never told me he had nothing to do with Lisa's death.

Q: Now, did you ever tell Detective Robbins anything more than you're telling us here today?

A: Nothing besides -- I might have seen them argue a couple times, but me [sic] and the women argue all the time.

Q: Well, let me ask you this. Did you lie to Detective Robbins at all?

A: I didn't lie to him at all, period.

Q: Did you tell him that [Jackson] asked you to say you were together at the time Lisa was killed?

A: Yeah, I did say that.

Q: Was that true or not?

A: Like I told you, I said that because he told me -- he said that -- if Mr. Jackson said that, then he lied. He might have asked somebody else that in my presence, but, like I said, I was on the run from the law at the time. I couldn't talk to the police, anyway.

Q: All right. Did he or did he not ask somebody else to say they were together in your presence?

A: I really don't recall.

Q: Do you recall being present with Aaron Bowles?

A: Well, Mr. Bowles said I was present, but I really don't recall.

* * *

Q: Now, did Detective Robbins force you to say anything that would be on that recording?

A: He didn't force me to say nothing. With the promises, it was easy to say, that he pretty much -- the first time he came down, he told me -- he pretty much told me that all I had to say was that Mr. Jackson asked me to say he was with his us, [sic] watching the basketball game, because Mr. Bowles had already said it, and then he said Mr. Jackson had already said it. I told him the very first time he came to see me that I was running from the police, so how could I say something like that? I wasn't trying to talk to the police, period.

Q: Well, let me ask you. Did you tell Detective Robbins that was true or not?

A: Yeah, so I can come and get on the stand -- like I told you, so I can come and get on the stand and tell the truth, because if I wouldn't have, you know, what'd he promise someone else to come up here and say whatever they going to come and say.

Q: Well, this is important. Are you telling us that you were lying when you said that to Detective Robbins or not?

A: I just told you.  I said it so I can come and get up here and tell the truth. I don't know what he promised somebody else to say whatever they going to say when they get up here.  And the man deserves a fair trial.  I'm not going to be the one that -- to come up here and do that.

Q: What are you claiming you were promised?

A: Time off my sentence, which -- and a permanent stay at Milan.
Q: Detective Robbins told you he could get time off your sentence?

A: And a permanent stay at Milan.

* * *

Q:  Okay.  Is there anything Detective Robbins encouraged you to say that wasn't true?

A: I told you why I said what I said, is I wanted to come and get up here and tell the truth.  If I wouldn't have said nothing, I wouldn't have been able to come and get up here and speak the truth, man.  Just like I told you, this man deserves a fair trial.  I thought it was innocent till proven guilty, not guilty first.

Q: I'm going to ask you one more time about what you told Detective Robbins.  Were you or were you not present when the defendant asked somebody to say there were together?

A: To be truthful with you for real, I really don't recall.

Q: Did you tell Detective Robbins that?

A: Yeah, because he made it easy for me.

Q: Are you saying you lied to Detective Robbins?

A: I told you already -- I answered that question already how many times?

Q: You have claimed you're here to tell the truth.

A: I just told you the truth.  I'm not going to come here and do the same thing to him what happened to me.

Q: You know, all anybody wants from you is the truth, but I'm having a hard time understanding what you're saying.  Was it the truth or not what you told Detective Robbins?

A: It's easy to say that when he told me Mr. Bowles already said it and Mr. Jackson already said it.  It's easy to say that.

Q: Did you say it, too?

A: After he told me to say it, yeah, I said it.

Q: Is it true or not that you were with Aaron Bowles and the defendant when the defendant asked Aaron Bowled to lie and say they were together.

A: To tell you the truth, like I just told you, I really don't recall.

(*Id.* at 147-53.)

The prosecution offered no further evidence and Plaintiff presented no evidence. (*Id.* at 154-155.)  Plaintiff argued that the evidence did not support a finding of probable cause that he was guilty of the crime and that he should not be bound over for trial.  (*Id.* at 155-58.)  The prosecution argued that Plaintiff's inconsistent stories were "circumstantial evidence of guilt."  (*Id.* at 158-59.)  "He originally tells Detective Frank Combs that he's with Brian Williams when he discovers the body . . . . When that doesn't pan out, he apparently goes to Celeste Craig and convinces her to lie about it." (*Id.* at 159.)  Regarding Weaver's testimony, the prosecution argued, "[p]ossibly -- and, honestly, Your Honor, I couldn't follow what Billy Weaver was telling us, whether he was present or not when the defendant asked someone else to also provide a false alibi for him."  (*Id.*)  Further, according to the prosecution, Plaintiff dramatically changed his story from entering Shaw's apartment through an unlocked door to then a locked door that caused Plaintiff to peer and enter through a window.  (*Id.*)  Finally, the prosecution argued:

we've heard from witnesses who've testified that [Jackson] threatened to do the same thing to him that he did to his baby's mother, and we know

what that has been. One of the witnesses talked about [Jackson] being clear that he had gotten away with this. That was as recently as a year ago, Your Honor.

(*Id.*)

The court recited the probable cause standard and noted that, due to the parties' stipulation, the question of whether a homicide occurred "is automatic." (*Id.* at 160.)

The court then turned to whether probable cause connected Plaintiff to the homicide:

> Now, this is one of those preliminary examinations -- happens every once in a while -- that, after the preliminary examination, you probably have more questions than you had before the preliminary examination. There are a whole bunch of unanswered questions. And I understand that occurs in a lot of cases. It occurs probably more often that not that there are unanswered questions that we don't get to resolve at the time of the preliminary examination.
>
> And some of the things that's jumped to my mind are the detective testified that -- that would be Detective Combs -- testified that he took his shoes, that he thought he saw a pattern on his shoes that was consistent with what they saw at the scene, and then that was dropped. We don't know -- we haven't heard any testimony or seen any evidence to answer the question of whether or not those were his shoes that left those prints.
>
> Then there's a question about how -- if he was in the premises, how did he get there? He said he didn't have a key in response to Detective Combs's questions on a number of occasions, the detective testified, and he said he didn't have a key. Then he said the door was locked with a deadbolt lock. Now, I don't know if that -- if he was describing a deadbolt lock that had a key that could open it, or if it was just one of those deadbolt locks that can just be locked from the inside by some person inside.
>
> Then we have the question of the entrance. We saw the windows, and I don't know why -- I would sure like to have heard from somebody that those windows were capable of being opened and someone capable of coming in the windows and if the smudges that were on the exhibits -- I'm looking at Exhibit Number 3, is the one that shows -- it shows a close-up of the window and it's got some smudges on there that may or may not be a footprint. And the window may or may not be opened or openable.
>
> So I don't know. I don't know any answers to those things. But, with the statements attributed to [Jackson] and with the circumstantial evidence

and with his -- the overall -- the bar is not that high. There is probable cause, circumstantially, to believe that this defendant committed that crime. Obviously, it's a question of fact for the jury and, obviously, there are a whole lot of questions that are unanswered at this time, and I think a jury is going to be sitting, listening to this -- will have those questions, too, and maybe they'll get answers, maybe they won't.

But there is probable cause that he did it. And, obviously, there's not even an argument about whether or not this was a homicide. So I will bind him over on the count of open homicide.

(*Id.* at 160-62.)

Defendant Robbins contends that Jackson was bound over after the August 8, 2005 preliminary examination for the murder charge while already in custody for unrelated charges. (Def.'s Br. at 21.) Time served for those unrelated charges expired on January 13, 2006. (*Id.*)[9] Plaintiff was released on January 13, 2006, after James Holland, Jr. confessed to the Shaw murder. (*Id.*; 1/12/06 Supplemental Report by Detective Robbins at 904-06, Def.'s Mot. Ex. 43.)[10]

Plaintiff filed the instant lawsuit on November 29, 2006. He makes the following allegations against Defendant. "Defendant Robbins knowingly and falsely created false witness testimony and evidence to have Christopher Jackson wrongfully arrested in 2005 and held in jail on false charges including first-degree murder, second degree murder and manslaughter for over six months . . . ." (Pl.'s Compl. at ¶ 11.) Specifically,

---

[9]Plaintiff does not dispute either of these factual claims in his response to Defendant's motion.

[10]At the October 31, 2007 hearing, Defense counsel submitted an October 22, 2007 transcript of Plaintiff's testimony in what appears to be Holland's trial in state court for the murder of Shaw. Defense counsel argued that several of Plaintiff's sworn admissions undercut his instant claims. Defense counsel confirmed for the court that Holland was convicted. For purposes of this opinion and order, the court will not rely upon this transcript. For completeness of the record, the court asked Defense counsel to file the transcript as a supplement.

Plaintiff alleges that Defendant told Shannon Davis to lie and testify that Plaintiff tried to kill her with a phone cord.  (*Id.* at ¶¶ 12-13.)  Plaintiff further alleges that "witness Billy Weaver testified that Detective Robbins told him to say things that were not true about Mr. Jackson."  (*Id.* at ¶ 15.)  Defendant allegedly lacked probable cause, knew Plaintiff was innocent and "signed a false affidavit and/or statement to have Plaintiff charged with false murder charges and to be wrongfully held in confinement."  (*Id.* at ¶¶ 16-17.)

Plaintiff claims Defendant deprived him of the following constitutional rights in violation of 42 U.S.C. § 1983: (1) unreasonable search and seizure under the Fourth Amendment and (2) due process and equal protection of the laws under the Fourteenth Amendment.  (*Id.* at ¶¶ 19-22.)  Plaintiff also alleges Defendant violated state law: (1) False Arrest/False Imprisonment (Count III), (*id.* at ¶¶ 29-31), and (2) Malicious Prosecution (Count IV), (*id.* at ¶¶ 33-36).  The court will dismiss Count III, as "Plaintiff stipulates to dismiss the false arrest/false imprisonment count."  (Pl.'s Resp. at 9.)  For the reasons stated below, the court will grant Defendant's motion for summary judgment.

### B.  Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories,

admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party must first show the absence of a genuine issue of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 323). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). They must put forth enough evidence to show that there exists a genuine issue to be decided at trial. *Plant*, 212 F.3d at 934 (citing *Anderson*, 477 U.S. at 256). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52 (1986).

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment – the disputed factual issue must be material. *See id.* at 252 (emphasis and alteration in original) (citation omitted) ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'"). A fact is "material" for

purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted).

### C. Discussion

### 1. Federal Claims

Plaintiff brings all federal claims under Title 42, section 1983 of the United States Code, which provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. By its plain terms, 42 U.S.C. § 1983 requires proof of two elements in order to state a cause of action under that statute. First, Plaintiff must establish that some person has deprived him or her of a federal right. *West v. Atkins,* 487 U.S. 42, 48 (1988). Second, Plaintiff must demonstrate that the person who deprived him or her of that right acted under color of state or territorial law. *Id. See also Enertech Elec, Inc. v. Mahoning County Comm'rs,* 85 F.3d 257, 259-60 (6th Cir. 1996); *United of Omaha Life Ins. Co. v. Solomon,* 960 F.2d 31, 33 (6th Cir. 1992). The court concludes as a matter of law that Plaintiff cannot demonstrate the first requirement.

The court's detailed reiteration of Plaintiff's preliminary examination hearing, set forth above, demonstrates the proposition that Defendant had ample evidence supporting probable cause to arrest Plaintiff and to seek charges against him for the murder of Shaw. The many witnesses who testified reveal a methodic and far-reaching

investigation of a cold case.  The mere fact that Plaintiff was not charged in 1991 says nothing about whether he was properly charged in 2005.  Further, his eventual release also says nothing about whether he was deprived of his constitutional rights when he was investigated, charged and bound over for trial.  "The Constitution does not guarantee that only the guilty will be arrested.  If it did, § 1983 would provide a cause of action for every defendant acquitted-indeed, for every suspect released." *Coogan v. City of Wixom*, 820 F.2d 170, 174 (6th Cir 1987) (quoting *Baker v. McCollan*, 443 U.S. 137, 145 (1979)) overruled on other grounds by *Frantz v. Vill. of Bradford*, 245 F.3d 869, 874 (6th Cir. 2001).

The totality of the evidence presented at the preliminary examination established that ample grounds had been known to Defendant for him to seek Plaintiff's arrest[11] and, in turn, for the state court's determination of probable cause that Plaintiff had committed murder.  The parties stipulated that Shaw's death was a homicide.  Detective Combs detailed two interviews with Plaintiff that revealed inconsistencies regarding (1) how Plaintiff entered Shaw's apartment, (2) whether Plaintiff spoke with Shaw on the night she died and (3) whether Williams accompanied Plaintiff to Shaw's apartment complex.  Discrepancies such as these cast doubt upon Plaintiff's truthfulness to the investigator, and may provide of circumstantial evidence of guilt or guilty knowledge.  Also, Plaintiff's explanation about finding the mother of his child lying on the floor, obviously in trouble, and his reaction of *kicking* her to see if she reacted, evinces an utterly unfeeling, cold heart that might well appear to an investigator -- and to an

---

[11]The complaint contains no specific allegations about how he was unreasonably searched and seized.

examining magistrate -- as consistent with complicity in the woman's death. Additionally, Plaintiff's act of leaving or abandoning an imperiled victim, who might still have been alive, before calling for immediate help would buttress the same conclusion. Further, Williams verified that Plaintiff expressed an intention to see Shaw and dropped Williams off before going to her apartment.

Two witnesses testified regarding Jackson and Shaw's strained relationship. Wyatt averred that Shaw was on edge in her apartment, peering out the window and cautioning him to keep his voice down in case Plaintiff was outside listening. Johnson, Shaw's best friend, overhead Shaw in an argument over the phone with a loud and angry male voice, after which Shaw showed Johnson a knife Shaw kept under her mattress for security in case Plaintiff appeared and stated that Plaintiff warned if he could not be with Shaw then no one could.

Craig's testimony suggested Plaintiff's guilt to the extent that he asked her to give Plaintiff a false alibi when she spoke to the police. Finally, McCormick, Reed and Witherspoon, Plaintiff's former girlfriends, recounted Plaintiff's similar physical threats and declarations about impunity for treating them like Shaw, his "baby mama." In light of all this inculpatory evidence, the state court had powerful factual underpinning for its decision to bind Plaintiff over for trial. The same evidence is indicative of Defendant's thorough investigation and well-grounded decision to seek Defendant's arrest and prosecution. Plaintiff's contention that Defendant signed a false statement that led to a wrongful prosecution simply finds no support in the record.

Regarding the allegedly false evidence that Defendant arranged for the preliminary examination, the court finds that Plaintiff's argument lacks merit. First, the

court is doubtful that there is a material question of fact regarding the falsity of the evidence.  Weaver's testimony was largely unresponsive and, intentionally or otherwise, confusing.  On at least two points he was clear: he repudiated under oath any alleged attempt to say anything false at the behest of Defendant, and denied clearly that he had lied to Detective Robbins.  When asked, "Did you lie to Detective Robbins at all?" he answered, "I didn't lie to him at all, period."  (Preliminary Examination at 150, Def.'s Mot. Ex. F.)

On the substantive issue of whether Weaver was present when Plaintiff asked someone else to lie for Plaintiff, Weaver could respond only with, "I really don't recall." (*Id.* at 150, 153.) And, when asked if he had *truthfully* reported such a request by Plaintiff to Detective Robbins, Weaver repeatedly avoided giving a direct answer by referring to "the reason" for him saying so or referring elliptically to things he claimed to have earlier testified about.  (*Id.* at 148-53.)  Weaver either said nothing at all or he said nothing damaging about Plaintiff.  With respect to the allegedly false testimony of Davis that Plaintiff attempted to kill her with a telephone cord, Plaintiff merely presents a partly illegible "witness statement" by her that is not notarized or otherwise sworn.  (2/27/06 Davis Witness Statement, Pl.'s Resp. Ex. 2)  This statement fails to raise a material question of fact regarding whether Defendant had Davis lie at the preliminary examination.

Moreover, even if any of the above evidence was indeed false, there can be no question of fact that Plaintiff would have still been bound over for trial.  Weaver's testimony was equivocal and not particularly damaging to Plaintiff.  Davis's testimony was cumulative to the extent it tended to prove the same points that the testimony of

McCormick, Reed and Witherspoon, Plaintiff's other former girlfriends, already tended to prove. Even if Davis's testimony is understood to claim that Plaintiff attempted to kill her with a telephone cord and that testimony is viewed as distinct, Plaintiff already faced myriad other circumstantial evidence of guilt that, as described above, weighed heavily against him.

Viewed in isolation, the mere existence of false evidence does not give rise to the deprivation of a constitutional right. *See Landrigan v. City of Warwick,* 628 F.2d 736, 745 (1st Cir. 1980); *White v. Tamlyn*, 961 F.Supp. 1047 (E.D. Mich. 1997). Plaintiff has failed to indicate with any persuasive effect how this allegedly false evidence led to any deprivation of a constitutional right. The thorough investigation and searching preliminary examination convince the court as a matter of law that none of Plaintiff's constitutional rights -- specifically, Fourth Amendment search and seizure and Fourteenth Amendment due process and equal protection rights -- were violated. The record as it appears before the court raises no question of fact concerning whether Plaintiff was properly investigated, arrested, charged and bound over for trial before his eventual release. The court will therefore grant Defendant's motion for summary judgment against Plaintiff's federal claims.[12]

### 2. State Claim

For the reasons stated above, the court will also dismiss Plaintiff's claim of malicious prosecution. Defendant is entitled to immunity under state law for actions taken in the scope of his official duties if his "conduct does not amount to gross

---

[12]The court need not reach Defendant's arguments concerning estoppel and qualified immunity.

negligence that is the proximate cause of the injury or damage."  Mich. Comp. Laws §

691.1407(2)(c).  Pursuant to the court's analysis above, there can be no question of

material fact regarding the absence of Defendant's gross negligence.  The record fails

to support any contention that Defendant is not entitled to qualified immunity with

respect to Plaintiff's claim of malicious prosecution.

### III. CONCLUSION

IT IS ORDERED that "Plaintiff's Motion to Strike . . ." [Dkt. # 22] is GRANTED IN

PART and DENIED IN PART.  The motion is GRANTED to the extent that the court will

strike the expert report of William J. Corbett (Exhibit G) and all portions of Defendant's

"Motion for Summary Judgment" (specifically, the bottom half of page 23) that explicitly

rely on that report.  The motion is otherwise DENIED, particularly with respect to

dismissing Defendant's "Motion for Summary Judgment."

IT IS FURTHER ORDERED that, pursuant to Plaintiff's stipulation, Count III

(False Arrest/False Imprisonment) is DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Defendant's "Motion for Summary Judgment"

[Dkt. # 14] is GRANTED.  A separate judgment will issue.


      S/Robert H. Cleland_____
      ROBERT H. CLELAND
      UNITED STATES DISTRICT JUDGE

Dated:  October 31, 2007

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, October 31, 2007, by electronic and/or ordinary mail.

      S/Lisa Wagner_____
      Case Manager and Deputy Clerk

(313) 234-5522